Filing # 104811050 E-Filed 03/12/2020 05:03:52 PM

## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
## CIVIL DIVISION

Q3 INVESTMENTS RECOVERY
VEHICLE, LLC, a Florida limited
liability company,

       Plaintiff,

v.

JAMES SEIJAS; QUAN TRAN; MICHAEL
ACKERMAN; DONNA SEIJAS; STEVE
SAUNDERS; Q3 HOLDINGS, LLC, a
Delaware limited liability company; Q3 I, LP,
a Delaware limited partnership; Q3 CRYPTO,
LLC, a Florida limited liability company;
SKYWAY CAPITAL MARKETS, LLC, a
Florida limited liability company; and WELLS
FARGO CLEARING SERVICES, LLC and
WELLS FARGO ADVISORS FINANCIAL
NETWORK, LLC, a Delaware limited liability
company,

       Defendants.

CASE NO.: 20-CA-002402
Section:
**JURY TRIAL DEMANDED**

_____/

## COMPLAINT

Plaintiff, Q3 Investment Recovery Vehicle, LLC, ("Plaintiff" or "Q3IRV"), as assignee of

claims against Defendants James Seijas ("Seijas"), Quan Tran ("Tran"), Michael Ackerman

("Ackerman"), Donna Seijas, Steve Saunders, Q3 Holdings, LLC, ("Q3 Holdings"), Q3 I, LP ("Q3

I"), Q3 Crypto, LLC, ("Q3 Crypto") (collectively, "Q3 or Q3 Entities"), Skyway Capital Markets,

LLC ("Skyway"), and Wells Fargo Clearing Solutions, LLC and Wells Fargo Advisors Financial

Network, LLC, both d/b/a Wells Fargo Advisors (collectively, "Wells Fargo Advisors") (all

defendants hereinafter collectively referred to as "Defendants"), sues Defendants and alleges as

follows:

## INTRODUCTION

1.      Q3IRV is an entity created by victims of a $35 million ponzi scheme to pool their claims and resources to attempt to recover their substantial losses.  Defendants Seijas, Ackerman, and Tran (collectively "the Founders"), through the Q3 Entities, are the primary perpetrators of the scheme.  The remaining defendants participated in the scheme, either directly or vicariously through an agent.

2.      From approximately August 2017 to December 2019, the Founders solicited funds to supposedly trade virtual currencies[1] through the Q3 Entities.  The Founders claimed, fraudulently, that the investments would be used to trade cryptocurrency using a proprietary and wildly successful algorithm developed by Ackerman.  More than 100 individuals and entities invested approximately $35 million in Q3 based upon these representations.

3.      Less than $10 million, and possibly even less than $5 million, of the $35 million investment was used to trade virtual currencies.  Instead, the Founders, with the assistance of the co-conspirator defendants, transferred at least $20 million dollars of the investors' funds to their personal bank accounts, spending lavishly on luxury properties and vehicles, among other things.

4.      This litigation is brought to right the terrible injustice caused by the Q3 Ponzi scheme.

---

[1] For the purposes of this Complaint, a virtual currency means a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction. Virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance. Virtual currencies typically use cryptographic protocols to secure transactions in that asset and use decentralized networks to track transactions between persons who are denominated only by publicly visible strings of characters. The transactions are captured in single blocks at a time, which independent operators (called "miners," a virtual analogy to actual miners whose efforts unearth gold, silver, and other precious metals) confirm by performing algorithmic proofs of work and for which they are usually awarded a sum of the virtual currency in question.

## JURISDICTIONAL FACTS AND THE PARTIES

5.    This is an action for money damages that exceed $30,000.00, exclusive of attorneys' fees and costs.

6.    Plaintiff Q3 Investments Recovery Vehicle, LLC, is a Florida limited liability company with its principal place of business in Hillsborough County, Florida. As of March 12, 2020, before the commencement of this action, at least twenty victims defrauded by Defendants (the "Investors")[2], assigned their claims set forth herein to Plaintiff. Plaintiff has standing to prosecute this action.

7.    Many of the of the Investors are residents of Florida.

8.    James Seijas is an individual who, upon information and belief, is a resident of Monmouth County, New Jersey.  He is a founder, general partner, managing member, principal, and/or part owner of each Q3 entity.  Seijas is an experienced financial investor with over 26 years of professional experience in the financial sector, and whose resume includes New York Stock Exchange Specialist for Bank of America / Fleet Specialists, Account Executive for Fidelity Investments, and Financial Advisor for Wells Fargo Advisors.

9.    Donna Seijas is an individual who, upon information and belief, resides in Morris County, New Jersey.  Upon information and belief, Donna Seijas is a managing partner and/or

---

[2] The term "Investors" herein refers to the following persons who have assigned their interest in the claims set forth herein to Plaintiff as of March 12, 2020: Alex Pang; Jason Soch; Jeffrey K. Waters; Jerry Chu; Jusmin Patel (Lux Living LLC); Kaizad P. Tamboli, MD (Zerophee Holdings, LLC); Vincent "Larry" Rabalais; Pulin Shah; Sachin Patel (Mayakoba Consulting, LLC); Sanket Vyas; Thomas McLaughlin/F&F Investment Fund; Anup Vora (Ashwood Lane Limited Partnership); Gobal Grandhige; Tony Garay (Simon Payments, LLC); Jeffrey Rouse MD; Sandhya Mani;  Brian J. Daigle; Jose Veloso (Emejo Holdings LLC); Raman Danrad; Todd Dufour; Shalin Shah; Salman Malad; Udit V. Patel; Harpreet Talwar; William Payne; Mohit Bansal; Mital Panara; Raymond Poon; Harminder S. Malik; Douglas C. Borden; Kindl Works, LLC; James Dixon; Sanket Vyas.

director of Q3 Crypto.

10.     Quan D. Tran is an individual who, on information and belief, resides in Pinellas County, Florida, and at all times material has resided in Pinellas County, Florida. He is a founder, general partner, managing member, principal, and/or part owner of each Q3 entity. Tran is a board-certified general surgeon who owned his own private practice for five years and has been employed as a general surgeon for BayCare Medical Group in Tampa since 2012.

11.     Michael Ackerman is an individual who, upon information and belief, is a resident of Stark County, Ohio. He is a founder, general partner, managing member, principal, and/or part owner of each Q3 entity. Upon information and belief, Ackerman is a former registered representative of TradeStation Securities, Inc., Fortis Clearing Americas, LLC, and UBS Securities, LLC, and has held Series 7 and 63 licenses until they lapsed in 2011. Ackerman was an institutional broker on the floor of the New York Stock Exchange for 16 years and has over 26 years of experience in the financial sector.

12.     Steve Saunders is an individual who, upon information on belief, is a resident of Hillsborough County, Florida. He is the Vice President of Operations of Defendant Skyway Capital Markets, LLC.

13.     Q3 Holdings, LLC, is a foreign limited liability company formed in Delaware with its principal place of business located in Pinellas County Florida. Q3 Holdings is a general partner of Q3 I, LP.

14.     Q3 I, LP, is a limited partnership formed in Delaware with its principal place of business located in Pinellas County, Florida.

15.     Q3 Crypto, LLC, is a Florida limited liability company, with its principal place of business located in Pinellas County, Florida.

16.    Skyway Capital Markets, LLC is a Florida limited liability company with its principal place of business located in Hillsborough County, Florida.

17.    Wells Fargo Clearing Solutions, LLC and Wells Fargo Advisors Financial Network, LLC, both d/b/a Wells Fargo Advisors, is a Delaware limited liability company with its principal place of business located in St. Louis, Missouri. On information and belief, at all relevant times, James Seijas was an employee of Wells Fargo Advisors.

18.    The Court has jurisdiction over the nonresident Defendants pursuant to § 48.193(1) & (2), Florida Statutes, as because Defendants have subjected themselves to the jurisdiction of this Court by committing tortious acts within this state from which Plaintiff's causes of action arise, and by operating, conducting, engaging in, or carrying on a business or business venture in this state, from which Plaintiff's causes of action arise, and by engaging in substantial and not isolated activity within this state.

19.    Venue is proper in this Court pursuant to Florida Statues §§ 47.011, 47.021, 47.041 and 47.051 because one or more Defendants are domiciled in Hillsborough County, Florida, and because a substantial portion of the acts or omissions giving rise to this Complaint occurred in or were directed at individuals or entities domiciled in Hillsborough County, Florida.

## GENERAL ALLEGATIONS

20.    Defendants' fraudulent actions as described herein are the basis for two separate complaints filed by the Securities and Exchange Commission and the Commodity Futures Trading Commission against Ackerman, as well as a criminal indictment for wire fraud and money laundering.

### *Ackerman, Tran, and Seijas form Q3 Trading Club*

21.    Seijas and Ackerman, each with over 20 years' experience in the financial sector,

were long time business associates. Upon information and belief, Seijas, who was Tran's financial advisor, introduced Tran to Ackerman.

22.     In early 2017, Ackerman, Tran, and Seijas ("the Founders") founded a virtual currency trading account at the cryptocurrency exchange known as Q3 Trading Club.

23.     The Q3 Trading Club account was initially funded with a combined $15,000 from the Founders, and Ackerman was primarily responsible for the virtual currency trading in the account.

24.     In June 2017, Tran registered an entity called Q3 Crypto, LLC at his home address, with Tran, Ackerman, Seijas, and Seijas' wife, Donna Seijas, as members.

25.     On information and belief, the Founders and Donna Seijas used Q3 Crypto to carry out their scheme to defraud the Investors.

26.     In or around July 2017, the Founders began to solicit family and friends through Facebook and word of mouth to trade virtual currencies.

27.     Tran used his position as a surgeon to gain trust among other physicians in order to induce them to invest in Q3 Trading Club.

28.     For example, Tran was a member of a private Facebook group called the "Physicians Dads' Group" (the "PD Group"). All or substantially all of the members of the PD Group were physicians. In at least one post in the PD Group, Tran explained that he had joined a club in which members pooled their funds to trade cryptocurrencies and offered to explain the investment strategy to any member of the PD Group, upon request. Some of the members of the Facebook group either requested or were invited by Tran to invest in the Q3 Trading Club.

29.     The majority of investors in Q3 are physicians and pooled their money to invest in cryptocurrencies.

30.     The total amount invested in Q3 Trading Club was approximately $1 million.

31.     Tran told investors that they were entitled to 50% of any trading profits, and that Tran, Seijas, and Ackerman were entitled to the other 50%.

32.     New investors were directed to wire their capital contributions to Tran's personal bank account.  Tran then wired those funds to digital currency trading platforms, where the Investors' funds were converted to a cryptocurrency account purportedly traded by Ackerman.

33.     In August 2017, Q3 sustained a substantial trading loss, after which Ackerman told the other Founders that they needed to change their trading strategy.  As a result, the other Founders agreed to change the fund's strategy, and represented to their Investors that Ackerman would create a new "trading algorithm" that would result in higher returns.

34.     After the Founders implemented their new trading strategy using the new algorithm Ackerman supposedly created, Tran reported to an investor that the virtual currency trading was highly successful, averaging monthly trading returns of approximately 13-15%.

35.     In late 2017, the cryptocurrency was sent to an offshore digital currency trading platform incorporated in the British Virgin Islands where Ackerman opened a trading account (the "Q3 Trading Account").

36.     By January 2018, the Founders were directing all Q3 trading through the Q3 Trading Account.

37.     Also in January 2018, Tran and Seijas resumed their solicitation of new investors through text messages, emails, and Facebook groups.

### Ackerman, Tran, and Seijas Transition from Q3 Trading Club to Q3 I, LP

38.     On or about March 2018, the Founders pitched a new model to their Investors whereby every investor would receive monthly payments from the proceeds of the cryptocurrency

trading.

39.     To implement that model, on or about July 27, 2018, the Founders formed Q3 I, LP, with the goal of raising $15 million from limited partners.  Ackerman, Tran, and Seijas were and remain general partners of Q3 I.

40.     On or about September 2018, Tran sent a letter to Q3 Trading Club Investors, discussing the transition from an investment club to a limited partnership.

41.     Beginning no later than November 1, 2018, through December 2019, the Founders offered Investors the opportunity to invest in limited partnership interests in Q3 I.

42.     The Founders marketed the Q3 I investment to potential investors through the distribution of a private placement memorandum (the "PPM"), a limited partnership agreement, and a subscription agreement.

43.     The PPM, dated November 1, 2018, represented that Q3 I was seeking up to $15 million in investor contributions.  According to the PPM, Q3 I would use investor funds to invest in cryptocurrencies using "proprietary high velocity trading software in a methodically risk mitigating fashion…."

44.     The PPM also represented to Investors that over the course of the prior two years, the Founders had "successfully traded various crypto currencies through various crypto exchanges using proprietary algorithmically driven software for other pooled investment groups."

45.     According to the PPM, Q3 I would use the algorithms and the Founders' trading experience to generate trading profits, 50% of which would go to Q3 I's general partner, Q3 Holdings, and 50% of which would be received by Investors.

46.     In December 2018, subscription documents were sent to existing Investors.

47.     By December 2019, Q3 had raised at least $33 million from more than 150

Investors located throughout the United States.

### *The Founders were the Controlling Persons and Agents of Q3*

48.     Ackerman, Seijas, and Tran were the controlling persons of each Q3 entity. Ackerman, Tran, and Seijas were founders of Q3 and had full access to and authority over the Q3 trading accounts.

49.     Ackerman created the algorithm that Q3 purportedly used to conduct trading.

50.     Ackerman and Seijas conducted substantially all trading on behalf of the Q3 Entities.

51.     Tran conveyed to Investors that he had complete log-in access to all the trading accounts and observed the trading accounts daily.

52.     Ackerman took screenshots of the purported trading accounts to prepare reports for the Investors.

53.     Tran prepared misleading reports and statements that were given to Investors.

54.     Seijas and Tran sent reports to Investors that misled them about the purported profits.

55.     Seijas and Tran solicited new Investors and actively marketed Q3.

56.     Ackerman, Seijas, and Tran had the ability to hire, fire, and set salaries for certain employees at Q3.

57.     Through their solicitation of potential and existing Investors, their active marketing of Q3 by providing information regarding their trading of the Q3 accounts, and their cryptocurrency trading, Ackerman, Seijas, and Tran acted as agents of Q3.

### DEFENDANTS' FRAUD

58.     To entice potential Q3 investors to invest in their scheme, Defendants knowingly

and falsely represented that Q3 was profitably trading virtual currencies, earning monthly returns of approximately 15%.

59.     From at least August 2017 up to and including December 2019, Ackerman, Seijas, and Tran, individually and in active concert, engaged in fraudulent conduct by making false statements and furnishing false documents concerning the balance of investor trading accounts, which were relied upon by Investors in determining what funds were properly payable to the Investors and to the Founders.

60.     During that time period, Ackerman, Seijas, and Tran engaged Saunders, through his company Skyway, to generate and disseminate reports to their Investors conveying information concerning the balance of those Investors' trading accounts.

61.     At the time they generated and disseminated those reports, Saunders and Skyway knew or should have known that the information contained in those reports was false.

62.     The Investors relied upon the reports generated by Saunders and Skyway when determining what funds were properly payable to the Investors and to the Founders.

63.     Despite Defendants' representations to potential and existing Q3 Investors that their virtual currency trading was highly successful and that Q3 Investors were free to withdraw the profits earned in their accounts after one year, Defendants did not trade virtual currencies successfully and most of Q3 Investors' money was misappropriated or lost in trading.

## *Defendants Made False and Misleading Representations to Q3 Investors*

64.     During the relevant period, the Founders told prospective and existing Q3 Investors that Q3's virtual currency trading was consistently profitable and that Q3's money continued to grow under their management.

65.     Defendants Ackerman, Tran, and James Seijas knowingly made various false and

fraudulent statements and material omissions to prospective and existing Q3 Investors to conceal their fraudulent scheme, including but not limited to the following:

a. "On average we make about 0.5% daily on invested income. Yes you read that correctly. And that amount is compounded continuously as profit is made."

b. "[W]e can offer tremendous returns of roughly 15% a month with precise and limited risk."

c. "We make roughly 13-15% total profit for each month. This has been a consistent pattern over the last six months."

d. "Profits are continuously reinvested thus compounding continuously. These returns have been consistent since August 2017."

e. "There are a few costs of operations (minor salaries, an office, licensing fees and other costs)."

f. "The algos are right about 75% of the time and wrong 25%. So we make much more money than we lose."

g. "It's much less risky than buying and holding a coin that could go to zero."

h. "Luckily the algos are correct in predicting the direction of momentum for a coin 75% of the time – I'll take that in Vegas any day. We end up losing on 1 of 4 trades. Nets us positive everyday."

i. "In fact we haven't had a negative day in 6 months!"

j. "[B]y having a mathematically guaranteed loss ratio that is below 25%, we can guarantee winning trades as long as there is volatility in the marketplace."

k. "[W]e have mathematically determined a strategy that allows us to gain more than we lose in any life cycle."

l. "We continue to remain spot on with our programming, continual enhancements and ratio goals. What started out with an eye towards a great way to make a little money has quickly manifested into a longer-term proposition."

m. "It's been a winning strategy that has been tested through every peak and trough of this market over the last two years without failing."

n. "Algorithms are managed 24/7 by our chief trading officer, Michael Ackerman."

66. Contrary to the representations to the Investors, only about $10 million of the $33 million raised from Investors was ever invested in cryptocurrencies.

67. To conceal the truth from Investors, the Founders sent Q3 Investors fraudulent account statements that contained fictitious account balances and monthly totals.

68. Additionally, the Founders engaged Saunders and Skyway to send fraudulent account statements containing fictitious account balances and monthly totals to the Q3 Investors.

69. Additionally, from at least March 2018 until December 2019, the Founders falsely reported Q3's trading profits and account balances to the Investors, misrepresenting the purported profits and the Investors' purported pro-rata shares in those fictitious profits.

70. As part of their fraudulent scheme, Ackerman sent Seijas and Tran modified screenshots of the Q3 trading account statement balances as reflected on the online trading platform, falsely showing that monthly trading profits were at least 15%. Tran and Seijas used the doctored screenshots to prepare and disseminate false reports through monthly newsletters and/or emails to Investors.

71. Additionally, the Founders drafted and disseminated false email messages addressed to Investors touting trading profits of 15% or higher. Tran also falsely communicated to Investors through his personal Facebook account that the fund was doing well.

72.     At various points, Tran or Seijas reported trading profits of 15.95% for March 2018, 15.11% for April 2018, and 15.56% for August 2018 to Q3 Investors.

73.     On March 5, 2018, Tran forwarded Investors a message Ackman addressed to "Q3 Members" stating "our profitability maintained a 15+ monthly performance."

74.     On May 8, 2018, Ackerman sent Seijas and Tran an email message stating that Q3 experienced trading profits of 15.11% for the month of April 2018. That same day, Tran forwarded Ackerman's message to Investors.

75.     This and other messages to Investors were false and misleading. The trading profits were minimal at best, and the Q3 trading account had a balance of only $1,026,729.01 for the month ending April 2018.

76.     On September 5, 2018, Ackerman drafted and Tran sent a message to Investors stating that "we ended the month with a 15.44% gain." In truth, the account balance was $1,936,736.93 on September 1, 2018, which was about $1.5 million less than the balance on August 1, 2018.

77.     The monthly trading balances from November 1, 2017 until September 1, 2018 were as follows:

| Date | Account Balance |
| --- | --- |
| November 1, 2017 | $6,027.44 |
| December 1, 2018 | $12,083.75 |
| January 1, 2018 | $145,028.76 |
| February 1, 2018 | $292,269.27 |
| March 1, 2018 | $689,558.36 |
| April 1, 2018 | $259,397.22 |
| May 1, 2018 | $1,026,729.01 |
| June 1, 2018 | $833,196.07 |
| July 1, 2018 | $2,931,675.46 |
| August 1, 2018 | $3,504,394.85 |
| September 1, 2018 | $1,936,736.03 |

78.     In September 2018, the Q3 I statement purported to show a fund balance from

9/1/2018 of $14,735,366.00, and a fund balance from 9/31/2018 of $17,015,594.00, with a 15.72% profit made for the month.

79.     On September 1, 2019, Ackerman sent a message to Tran attaching a screenshot purporting to show the Q3 Trading Account balance was about $181,930,351. Tran then used this information to send Investors account statements showing a substantially similar balance in the Q3 trading account and their pro rata share of trading profits. However, in truth, the Q3 Trading Account balance was only $1,502,145.57 on September 1, 2019.

80.     These fraudulent screenshots and reports indicated that Q3's crypto currency trading accounts had grown to more than $200 million. In truth, from November 2017 until December 2019, Q3's trading account had a monthly balance averaging about $1.7 million, and never had more than $6 million.

81.     By December 2019, the Founders were reporting an account balance to Investors of about $310 million. In truth, the account only held about $428,162.

### Defendants Failed to Disclose Material Transactions to Investors

82.     From about April 2018 until at least November 2018, the Founders failed to disclose to Investors that they paid themselves about $4 million of the Investors' funds as purported "licensing fees" based on Q3's purported use of Ackerman's new algorithm.

83.     The Founders were not entitled to any licensing fees and the licensing fees were not adequately disclosed to Investors. Even if they had been entitled to the fees and/or adequately disclosed, no licensing fees could have legitimately been charged because most of the Investors' funds were never invested in cryptocurrencies and were therefore not exposed to the purported algorithmic trading strategy.

84.     In November 2018, the PPM and Q3 I limited partnership agreement disclosed for

14

the first time that licensing fees could be charged.

85.     Specifically, the limited partnership agreement stated that the limited partners shall pay for "any and all software licensing fees payable to the [general partner, Q3 Holdings]."

86.     The PPM provides that: (1) the limited partners "will leverage a nonexclusive license from the [general partner, Q3 Holdings] to a proprietary algorithmic trading solution, focused on crypto currencies, and a unique batter of information data points to effectuate short, positional, swing trades on a high frequency, high risk mitigation basis," (2) limited partners shall pay "software licensing fees and expenses," and (3) "[a]ctual realized fees and expenses of the GP, as well as any employment or licensing contracts, can be reviewed at the investors request."

87.     The statements in the PPM and limited partnership agreement failed to fully disclose to Investors the true nature of the licensing fees, including the costs associated with the licensing fees, the methodology that would be used to calculate the licensing fees, and when the licensing fees would be assessed.

88.     Additionally, in December 2018, the Founders agreed amongst themselves that if Q3 I reached fifteen percent (15%) monthly profitability, then they would be entitled to any excess over that 15% threshold. This was never disclosed to Investors, and Q3 I never actually achieved monthly profits of 15%.

### Defendants Misrepresented Q3's Internal Controls

89.     Defendants fraudulently misrepresented to prospective and existing Q3 Investors that the money in the Q3 trading account was secure because no one person could withdraw or transfer money from the Q3 trading account without consent of one or more of the other Founders.

90.     From about March 2018 until at least October 2019, the Founders told the Investors that controls were in place to protect the dissipation of investor funds. Specifically, they told

Investors that one Founder could not transfer funds into or out of the Q3 trading account without authorization from another Founder.

91.     In April 2019, Tran told several Investors that all three of the Founders had access to the trading accounts and showed several of the Investors a screenshot on his phone that purported to be a trading account with $100 million in it.  When asked by the Investors about validating the money in the account, Tran told the Investors that he had full access to all the accounts at any time and that he observed them daily.

92.     In October 2019, during a meeting between the Founders and Investors, the Founders told Investors that each of the three Founders is required to have a separate digital key in order to transfer any money from one account to another.  During the same meeting, Ackerman made multiple comments about how he wanted to see the fund go to "20-25% monthly returns." When an investor asked Seijas about any potential for fraud, Seijas replied, "if we wanted to rip you off then we would have done it months ago, we now have too much money and making money honestly is going to be enough."

93.     Further, Defendants fraudulently misrepresented to prospective and existing Q3 Investors that the money in the Q3 trading account was safe because 70% of the funds in the trading account were kept in cash and only 30% was used to trade.

94.     These representations were false. In truth, there were no safeguards in place to prevent one Founder's unilateral transfer of funds.  Contrary to representations to Investors that the Founders would properly invest the funds, the Founders used them to enrich themselves.

### *Defendants Misappropriated Q3 Investors' Funds*

95.     Contrary to the Founders' representations to potential and existing Investors that investor money would be invested in cryptocurrency trading, from March 2018 until December

2019, each Founder misappropriated millions of dollars of investor funds for personal use.

96.     The Founders directed Q3 Investors to transfer funds into bank accounts controlled by or operated for the benefit of the Founders.

97.     For instance, the Founders instructed Q3 Investors to transfer funds into a bank account held in the name Q3 at Signature Bank.

98.     Upon receipt, or very soon thereafter, the Founders misappropriated these Investor funds by transferring them to other accounts controlled by the Founders.

99.     The Founders, individually and in concert with each other and the remaining Defendants, diverted Investor funds into accounts personally controlled by the Founders, and used the funds to purchase property and other items to conceal the nature, location, source, ownership and control of the funds.

100.    The Founders misappropriated a substantial majority of the Q3 Investors' funds for improper and unauthorized uses, such as to wrongfully enrich themselves through the purchase of homes, cars, and other luxury items.

101.    For example, from October 1, 2019, through October 2, 2019, Q3 received new funds from five Investors totaling $797,000. Q3 deposited these new funds into its Signature Bank account. Then on October 2, 2019, Defendants wired $500,000 to Ackerman and $517,767.16 to Seijas and Tran from the Q3 Signature Bank account.

102.    Ackerman misappropriated approximately $7.4 million for himself and used these funds to purchase at least five pieces of real estate, among other things.

103.    Ackerman used Investor funds to, among other things, purchase and renovate a new home, pay more than $600,000 for personal security services, purchase more than $100,000 worth of jewelry at Tiffany & Co., and purchase three cars.

104.    Upon information and belief, Tran used Investor funds to, among other things, take his family on a pricey luxe vacation to the Maldives, purchase a 50-foot Okean motor yacht for approximately $1.4 million, and purchase a Bentley for approximately $264,300.00.   Upon information and belief, Tran paid for the yacht and car in cash.

105.    Upon information and belief, Seijas' wife, Donna Seijas, who is a managing member of Q3 Crypto, had actual knowledge of the Founders' fraudulent scheme.

106.    Upon information and belief, Seijas and Donna Seijas used Investor funds to, among other things, purchase at least one home in Delray Beach, Florida for $3.6 million.

107.    The Founders' misappropriation of Investor funds and use of those funds for personal purchases was not disclosed to potential or existing Investors.

108.    To the extent any Q3 Investors received any purported investment redemptions from the Defendants, those purported redemptions actually consisted of funds that Defendants misappropriated from other Q3 Investors, in the nature of a Ponzi scheme.

109.    For example, on October 1, 2019, Q3 held $873,000 in its Q3 I account and $1,996,457.11 in its Q3 Holding accounts at Signature Bank.  Then in early October 2019, Q3 received a redemption request for $3,000,000 from an existing Q3 investor.

110.    To meet the investor's $3,000,000 redemption request, Q3 transferred approximately $996,000 of the other Q3 investor funds from Q3's trading account at a virtual-currency exchange to its Q3 I bank account at Signature Bank, from which said investor's $3,000,000 redemption request was paid.

111.    Had Defendants not misrepresented Q3's profitability or their misappropriation of the Investors' funds, those Investors would not have invested or continued to invest in Q3.

112.    Based on the actions and misrepresentations above, Defendants' misrepresentations

18

and omissions of material facts about the Investors' investments in Q3, and misappropriation of those Investors' funds, were intentional, malicious, and calculated to cause harm to the Investors.

113.   These actions were willful, wanton, and utterly intolerable in civilized society.

114.   Defendants knew or should have known when they misrepresented Q3's profits and misappropriated the Investors' funds that those actions would result in the loss of the Investors' investments.

115.   Despite that knowledge, over a period of approximately two years, Defendants repeatedly misrepresented Q3's financial status and misappropriated the Investors' investment funds with intent to cause that harm to those Investors.

116.   The Founders directed Q3's trading and were principals in each company.   They each knew or were reckless in not knowing the representations made to Investors about the offering and falsity of the representations.

117.   All conditions precedent to the maintenance of this action have occurred, have been satisfied, or have been waived.

### COUNT I – FRAUD
*Against All Defendants*

118.   Plaintiff incorporates the allegations in paragraphs 1 through 117 as if fully set forth herein.

119.   This is an action for fraud at common law.

120.   Defendants, individually and in active concert, knowingly and intentionally made false statements of material facts with intent to damage the Investors, including without limitation, the following:

  a.   Issuing written statements misrepresenting the monthly rate of return for the Q3 accounts;

    b.  Issuing written statements misrepresenting the total value of the Q3 account;

    c.  Verbally misrepresenting that Q3 trading accounts were secure because withdrawals and transfers required verification from multiple Q3 Founders; and

    d.  Failing to disclose, and omitting, that Defendants were misappropriating Q3 Investors' funds.

121.    Defendants, individually and in active concert, knew or should have known that these statements were false at the time they were made.

122.    Despite this knowledge, Defendants, individually and in active concert, with the intent to induce existing and potential investors to invest in Q3, represented to the Investors that its Q3 investments were being appropriately safeguarded and were extremely profitable.

123.    Defendants' representations that the investments in Q3 were profitable and adequately safeguarded were material and resulted in Investors losing millions of dollars' worth of investments.

124.    Defendants' wrongful conduct as described herein was knowing, willful, wanton, in disregard of Investors' rights.

125.    As a direct result of Defendants' fraud, the Investors suffered damages including, but not limited to actual damages, attorneys' fees, and costs.

126.    As assignee of the Investors' choses in action, Plaintiff has standing to prosecute this claim against Defendants.

WHEREFORE, Plaintiff respectfully demands full and final judgment against Defendants, jointly and severally, awarding damages together with interest on the judgment at the proper legal rate, plus court and litigation costs, expenses, reasonable attorneys' fees, and for such other relief to which Plaintiff may show itself rightly entitled.

## COUNT II – CONSPIRACY TO COMMIT FRAUD

*Against Quan Tran, Michael Ackerman, James Seijas, Donna Seijas, and Steve Saunders*

127.   Plaintiff incorporates the allegations in paragraphs 1 through 117 as if fully set forth herein.

128.   This is an action for damages against Defendants Tran, Ackerman, James Seijas, Donna Seijas, and Steve Saunders (the "Conspirators") for conspiracy to defraud the Investors of Q3.

129.   The Conspirators, individually and collectively, conspired and agreed to fraudulently represent to Q3 Investors that their investments were being appropriately managed and safeguarded and that the investments were profitable when in fact the majority of the investments were never invested in cryptocurrencies but rather used for Tran, Ackerman, James Seijas, and Donna Seijas's personal benefit.

130.   The Conspirators each knowingly and willfully acted in furtherance of the conspiracy.

131.   Between August 2017 and December 2019, in furtherance of the conspiracy to defraud their Investors, Ackerman doctored screenshots of the trading accounts.

132.   Tran and James Seijas used the doctored screenshots to send false reports to Investors that purported to show gains of 15% each month.

133.   Saunders, through Skyway, took information from Ackerman, Tran, and James Seijas and used that information to generate false reports that he disseminated to the Investors.

134.   Saunders knew or should have known that the reports were false and misleading at the time he generated and disseminated them.

135.   Donna Seijas participated in the fraud through her membership and management of Q3 Crypto and benefitted from that fraud through the disbursements and payments made to her

and James Seijas from Q3.

136.    Also, in furtherance of the conspiracy, Tran and James Seijas made many false representations to Investors and potential investors such as, "[w]e make roughly 13-15% total profit for each month," and "[w]e have not had a negative day in 6 months."

137.    Throughout 2019, in furtherance of the conspiracy, Tran, Seijas, Ackerman, and Saunders each made false statements to Investors regarding the supposed safeguards in place to protect the Investors' funds.

138.    Throughout 2019, despite their knowledge of the falsity of those statements, each of the Conspirators acted to generate and disseminate the false statements and reports with the intent to defraud the Investors.

139.    The Conspirators knew or should have known that these misrepresentations were false when they were made. They never intended to invest the entirety of Investors' funds into Q3 and instead misappropriated the investments for their personal benefit and operated Q3 as a Ponzi scheme.

140.    In reliance on the Conspirators' false representations, the Investors continued to invest in Q3.

141.    As a result of the conspiracy, the Investors have suffered millions of dollars in damages.

142.    As assignee of the Investors' choses in action, Plaintiff has standing to prosecute this claim against Tran, Ackerman, Seijas, Donna Seijas, and Steve Saunders.

WHEREFORE, Plaintiff demands Judgment against Defendants Quan Tran, Michael Ackerman, James Seijas, Donna Seijas, and Steve Saunders, awarding Plaintiff damages, pre-judgment interest, post-judgment interest, attorneys' fees, costs, and all other such relief as the

Court may deem just and proper.

## COUNT III – NEGLIGENT MISREPRESENTATION
*Against Quan Tran, James Seijas, Steve Saunders, and Skyway Capital Markets, LLC*

143.   Plaintiff incorporates paragraphs 1 through 117 as if fully set forth herein.

144.   This is an action for damages against Defendants Tran, James Seijas, Saunders, and Skyway for negligent misrepresentation.

145.   Tran, Seijas, and Saunders each made multiple misleading statements to Investors when they told Investors that Q3 investments were profitable and had adequate safeguards, and in sending falsified reports to Investors.

146.   These statements were false.

147.   Tran and James Seijas knew or should have should have known these representations were false, since Tran and James Seijas had full access to all Q3 trading accounts, James Seijas participated in the trading, and Tran observed the accounts daily.

148.   Tran and James Seijas intended to induce Plaintiff to rely on the misrepresentation by investing or continuing to invest in Q3.

149.   Saunders and Skyway knew or should have known these representations were false when made, because, on information and belief, Saunders and Skyway had access to Q3's financial information, demonstrating the falsity of the representations.

150.   Alternatively, if Saunders and Skyway did not know the representations were false, Saunders and Skyway were negligent in making these statements because they did not perform reasonable investigation to determine whether the veracity of the representations.

151.   As a result of Tran, James Seijas, Saunders, and Skyway's negligent misrepresentations, the Investors have suffered millions of dollars in damages.

152.   As assignee of the Investors' choses in action, Plaintiff has standing to prosecute

this claim against Tran, James Seijas, Saunders, and Skyway.

WHEREFORE, Plaintiff demands Judgment against Defendants Quan Tran, James Seijas, Steve Saunders, and Skyway Capital Markets, LLC, jointly and severally, awarding damages together with interest on the judgment at the proper legal rate, plus court and litigation costs, expenses, reasonable attorneys' fees, and for such other relief to which Plaintiff may show itself rightly entitled.

## COUNT IV – UNJUST ENRICHMENT
*Against All Defendants*

153. Plaintiff incorporates paragraphs 1 through 117 as if fully set forth herein.

154. This is an action for damages against all Defendants for unjust enrichment.

155. As alleged herein, the Investors have conferred a benefit on the Defendants in excess of $30 million.

156. Defendants knowingly voluntarily accepted and retained the benefit conferred.

157. The circumstances are such that it would be inequitable for the Defendants to retain the benefit without paying the value thereof.

158. As assignee of the Investors' choses in action, Plaintiff has standing to prosecute this claim against Defendants.

WHEREFORE, Plaintiff respectfully demands full and final judgment against Defendants, jointly and severally, awarding damages together with interest on the judgment at the proper legal rate, plus court and litigation costs, expenses, reasonable attorneys' fees, and for such other relief to which Plaintiff may show itself rightly entitled.

## COUNT V – BREACH OF FIDUCIARY DUTY
*Against Quan Tran, Michael Ackerman, James Seijas, and Donna Seijas*

159. Plaintiff incorporates paragraphs 1 through 117 as if fully set forth herein.

160. As general partners of Q3 I and managing members of Q3 Holdings, Q3 Trading

Club, and Q3 Crypto, Tran, Ackerman, James Seijas, and Donna Seijas each owed fiduciary duties

of loyalty and care to their limited partners and members, including Investors.

161. By virtue of their conduct described above, Tran, Ackerman, James Seijas, and

Donna Seijas willfully breached their duties of loyalty and care by committing fraud on their

Investors and misappropriating Investor funds for their own benefit.

162. As a result of their breaches of fiduciary duties, the Investors have suffered millions

of dollars in damages that Tran, Ackerman, James Seijas, and Donna Seijas either lost trading or

misappropriated for their personal gain.

163. As assignee of the Investors' choses in action, Plaintiff has standing to prosecute

this claim against Tran, Ackerman, James Seijas, and Donna Seijas.

WHEREFORE, Plaintiff respectfully demands full and final judgment against Quan Tran,

Michael Ackerman, James Seijas, and Donna Seijas, jointly and severally, awarding damages

together with interest on the judgment at the proper legal rate, plus court and litigation costs,

expenses, reasonable attorneys' fees, and for such other relief to which Plaintiff may show itself

rightly entitled.

## COUNT VII – NEGLIGENCE
*Against All Defendants*

164. Plaintiff incorporates paragraphs 1 through 117 as if fully set forth herein.

165. Defendants owed a duty of care to the Investors.

166. Defendants breached their duty of care to Investors through multiple

misrepresentations, and misappropriation of Investor funds.

167. As a result, and the proximate cause, of Defendants' negligence, the Investors lost

millions of dollars.

168.   Defendants' negligence, misrepresentations and misappropriation were committed in their capacity as managers, managing members, owners, and/or principals of Q3, and acted as agents of, and within the scope of their employment by Q3.

169.   As assignee of the Investors' choses in action, Plaintiff has standing to prosecute this claim against Defendants.

WHEREFORE, Plaintiff respectfully demands full and final judgment against Defendants jointly and severally, awarding damages together with interest on the judgment at the proper legal rate, plus court and litigation costs, expenses, reasonable attorneys' fees, and for such other relief to which Plaintiff may show itself rightly entitled.

## COUNT VIII – VICARIOUS LIABILITY
*Against Wells Fargo Clearing Services, LLC and Wells Fargo Financial Network, LLC, both d/b/a Wells Fargo Advisors, LLC*

170.   Plaintiff incorporates paragraphs 1 through 117 as if fully set forth herein.

171.   At all relevant times and during the course of conduct described herein, James Seijas was employed by Wells Fargo Advisors, and held himself out to Investors as working on behalf of Wells Fargo Advisors.

172.   On information and belief, throughout the course of Seijas's employment with Wells Fargo Advisors, Wells Fargo Advisors's policies and procedures required employees to regularly report to Wells Fargo Advisors concerning work they did outside the scope of their employment with Wells Fargo Advisors.

173.   On information and belief, Wells Fargo Advisors did not require Seijas to make regular reports concerning his involvement with Q3 or the course of conduct described above.

174.   Seijas's conduct as set forth herein was undertaken within the scope of his employment with Wells Fargo Advisors and in the ordinary course of his employment with Wells

Fargo Advisors.

175.    Because Seijas held himself out to Investors as working on behalf of Wells Fargo Advisors, the acts and omissions described herein were committed in his capacity as an agent for Wells Fargo Advisors.

176.    As assignee of the Investors' choses in action, Plaintiff has standing to prosecute this claim against Wells Fargo Advisors.

WHEREFORE, Plaintiff respectfully demands full and final judgment against Wells Fargo Advisors for its vicarious liability for the acts and omissions of its employee and agent, James Seijas, awarding damages together with interest on the judgment at the proper legal rate, plus court and litigation costs, expenses, reasonable attorneys' fees, and for such other relief to which Plaintiff may show itself rightly entitled.

### JURY TRIAL DEMAND

Q3IRV hereby demands a jury trial on all issues and claims so triable.

Dated: March 12, 2020

Respectfully submitted,

/s/ Paul B. Thanasides
Paul B. Thanasides
Florida Bar No. 103039
paul@mcintyrefirm.com
complexlit@mcintyrefirm.com
clservice@mcintyrefirm.com
Christa Queen-Sutherland
Florida Bar No.: 0091204
christa@mcintyrefirm.com
Mary R. Thanasides
Florida Bar No.: 107551
mary@mcintyrefirm.com
Garrett S. Severson
Florida Bar No.: 108259
garrett@mcintyrefirm.com
McIntyre Thanasides Bringgold Elliott

Grimaldi Guito & Matthews, P.A.
500 E. Kennedy Blvd., Suite 200
Tampa, FL 33602
Telephone: 813.223.0000
Facsimile: 813.225.1221
*Attorneys for Plaintiff*